---

## In re COBB.

### (District Court, E. D. North Carolina. October 4, 1899.)

1. BANKRUPTCY—RIGHTS OF SECURED CREDITOR.

A trustee in bankruptcy is vested by law with title to all the assets of the bankrupt, including securities in the hands of a creditor as collateral; and such creditor has no right to hold the securities until paid the amount of his debt, nor to sell or cancel them, or realize on them by the aid of a court or otherwise, independently of the bankruptcy proceedings, but he must surrender them to the trustee, who has sole authority to reduce them to money, and the claim of the creditor to priority of payment out of the proceeds will be adjudged and administered in the bankruptcy court, which alone has jurisdiction of the matter.

2. SAME—PREFERENCES.

Where a creditor of an insolvent banker, having about $1,300 on deposit with him, was applied to by him for a loan of money, and verbally agreed that the balance of his account should be used as part of such loan, and supplied the debtor with $1,900 more in cash, and received from him (though he had not demanded them) securities worth $7,000, to be held as collateral, and within four months thereafter the debtor was adjudged bankrupt, *held* that, as to the $1,300, the transaction was a preference voidable under the bankruptcy act, being a transfer of property to secure a preexisting debt, but as to the $1,900, the transfer being in good faith and for a present fair consideration, the creditor was entitled to be paid in full out of the proceeds of the securities.

### In Bankruptcy.

The referee certifies the following findings of fact and conclusions of law for review:

"That on the 12th day of October, 1898, J. Haywood Sawyer having on deposit with the bank of Guirkin & Co. the sum of $1,302.70, the firm of Guirkin & Co., then doing a general banking business, and desiring to obtain a loan of $3,000 or more, made application to said Sawyer for a loan of such amount; that G. W. Cobb, a member of the firm of Guirkin & Co., was informed by said Sawyer that he had on hand in the applicant's bank the sum of $1,302.70, and that he would and could obtain for him an additional sum of $1,900; that this amount of $3,202.70 was accepted by said Cobb for Guirkin & Co., and which, at the time of its acceptance by said Cobb, tendered and delivered certain collateral securities to the said Sawyer to secure said loan, but without previous demand or agreement therefor; that the sum of $1,302.70, then on general account in said bank to the credit of J. Haywood Sawyer, was verbally ordered paid over to said bank, and that the additional sum of $1,900 was paid to said Cobb, for the use of said bank, in cash; that thereafter, to wit, on the 19th day of October, 1898, the said Guirkin & Co., being insolvent, made a general assignment for the benefit of creditors; that J. Haywood Sawyer was employed as counsel for Guirkin & Co., bankers, whenever his services as counsel and attorney were required."

The referee's conclusions of law were as follows:

"From the foregoing facts I find, as a conclusion of law, that the said Guirkin & Co., through G. W. Cobb, to relieve themselves from financial embarrassment, borrowed the said sum of $3,200.70 from J. Haywood Sawyer, and at the time gave as security therefor the collaterals referred to in the testimony taken in this cause; that the entire sum so loaned the firm of Guirkin & Co. was for a present consideration, and that the transaction, from all the evidence, I find to be free from fraud in fact, and the loan so made was advanced in good faith to the debtors of Guirkin & Co. to enable them to further carry on their business for which the security above mentioned was taken; that the said J. Haywood Sawyer, though the attorney for said Guirkin & Co., was not fixed with knowledge of the insolvency of said bank constructively, as such attorney, nor was he fixed with any actual knowledge thereof. And I find that the said Sawyer was a purchaser in good faith, and for a fair consideration, and said transaction free from fraud. I therefore find that the said J. Haywood Sawyer is entitled to retain the said securities until therefrom he shall be paid the full sum of $3,200.70, with interest at six per cent. from the said 12th day of October, 1898, until paid: that, from the evidence of the commissioner filed in this cause, I find that said collaterals so deposited for said loan amount to the sum of about $7,000. All of which is respectfully submitted.

'L. J. Moore, Referee in Bankruptcy."

E. F. Aydlett and G. W. Ward, for appellant.

J. Haywood Sawyer, for appellee.

PURNELL, District Judge. The referee fails to find as a fact, which is shown by the testimony, that on the day of the transaction

under consideration there was less than $500 of currency on hand, or to consider the further fact, heretofore found by the court and evident from the record, that George W. Cobb was the only member of the firm of Guirkin & Co.; and in making the assignment the act of bankruptcy for which both George W. Cobb individually, and as surviving partner of Guirkin & Co., was liable, the adjudication was made as to both, or Cobb acting in the dual capacity. Bray v. Cobb, 91 Fed. 102. The assignment was by George W. Cobb, individually and as surviving partner of Guirkin & Co., and not a general assignment by Guirkin & Co. There is no evidence that Guirkin & Co. was a corporate body, but the firm seems to have been doing a private or individual banking business. The question to be considered is not whether the creditor, J. Haywood Sawyer, has a lien, or can retain the collaterals or security until he is paid; for it is familiar learning, and conceded in the argument, that, whatever priorities, liens, or rights he may have, they must be administered in the bankruptcy court. After an adjudication in bankruptcy, the bankrupt court takes jurisdiction of the estate and all matters pertaining thereto, and will administer the same to a final settlement. Parties having or claiming an interest in the bankrupt estate must submit them to the bankruptcy court. Blum v. Ellis, 73 N. C. 293; Withers v. Stinson, 79 N. C. 341; In re Gutwillig, 34 C. C. A. 377, 92 Fed. 337; Davis v. Bohle, 34 C. C. A. 372, 92 Fed. 325. The trustee is vested by law with the estate, and could by a proper action recover possession of the securities in possession of any one as collateral, subject to any valid lien such person might have on the proceeds of such securities. The vesting of title gives him constructive possession of the property the instant the title passes. Such property is then brought into the bankruptcy court in its entirety, and under its protection, as fully as if actually brought into the visible presence of the court. No other court and no person acting under process can, without permission of the bankruptcy court, interfere with it, and to so interfere is a contempt. The trustee is an officer of the court, and his possession, actual or legal, is the possession of the court. Taylor v. Carryl, 20 How. 583; Shields v. Coleman, 157 U. S. 168, 15 Sup. Ct. 570; Porter v. Sabin, 149 U. S. 473, 13 Sup. Ct. 1008; Freeman v. Howe, 24 How. 450; Loveland, Bankr. § 150.

The conclusion of law by the referee, "That the said J. Haywood Sawyer is entitled to retain the said securities until therefrom he shall be paid the full sum of $3,202.70," etc., is reversed. The nature of the securities delivered to Sawyer as collateral, as claimed, is not disclosed by the testimony; but he could not legally collect, realize on, or cancel the same, but, whatever their nature, they must be surrendered to the trustee, who alone is authorized to reduce the same to money, and the rights of claimant to a priority to the proceeds thereof will be duly adjudged and administered in this court. This court alone has jurisdiction.

This case might rest here until the creditor has surrendered the preference claimed, as provided he must do, in section 57g, before his claim can be allowed and the cause again presented for review; but as it is to the interest of the parties to close the estate, and it is

presumed claimant, being an attorney, will comply with the law, the real question may be adjudicated on the record now before the court. It would be useless circumlocution to require the case to be sent up a second time, on probably the same record.

The question is not whether Sawyer can retain the securities given him, claimed as collateral, but whether he is entitled to priority in the proceeds thereof for the payment 'of his debt or any part thereof, and, if a part, how much. In solving this question it is necessary to determine the relationship of the parties. As to the $1,302.70, it appeared on the books of Guirkin & Co., or G. W. Cobb banking as Guirkin & Co., as a deposit, or the balance of a deposit. A deposit is a naked bailment of goods or funds to be kept for the depositor without reward, and to be returned when he shall require it. In the case of deposits with a banker, the relation of the banker with his customer is that of debtor and creditor, and does not partake of a fiduciary character. In case of loss or failure the legal remedy of the depositor is an action of debt. The balance could not be reached by a bill in equity, as there is no trust raised. The banker is not liable for interest, unless expressly contracted for. This is familiar law, for which authorities are abundant. On the morning of the day before the transaction, Sawyer was simply a creditor of Guirkin & Co., or G. W. Cobb doing business as Guirkin & Co., without security. Had he drawn his check for the amount of the balance due him ($1,302.70), there was not enough currency (less than $500) in the banking house to have paid it. He knew Cobb was short of currency, for he told him he needed money, but it does not appear he knew how short he really was. But he did not draw a check. He simply said to Cobb, in effect, "use my deposit, or the balance to my credit." Could this change a pre-existing debt to a loan for a present consideration? The account had been running for several months. The first balance shown in the evidence is January 3, 1898, and a balance of $2,000 June 3, 1898. The balance was a pre-existing debt, and there is nothing in the facts shown or found to warrant the conclusion that the mere words or acts of the parties could change its nature, to give a priority for the amount in a distribution of the assets of the estate in bankruptcy. It appears there was no express contract, no note or memorandum given or made, no transfer of the collaterals, whatever they were (which does not appear); nor does it appear that an assignment, if made, should have been recorded. Cobb simply handed over the securities. Sawyer did not demand or seem to desire them. It was a loose way of doing business, and an implied contract as to this balance being secured is too indefinite, under the circumstances, to give it legal effect. When, where, and upon what did the two minds come together? The parties do not say, and the court cannot. If there was no contract, express or implied, no transfer or assignment, Sawyer was a naked bailee. But, putting it on the strongest ground (that there was an implied contract; that the securities were such as did not require a written transfer and registration thereof, and were given to Sawyer as collateral security for the $1,302.70), it was a preference given a creditor, within four months of the adjudication, for a pre-existing

debt. Section 60, subd. b, Act July 1, 1898. The statutory pro-, vision is not based on the knowledge of the creditor, but the condition of the debtor. The acts mentioned in this section are not such as were forbidden by the common law, or generally by the statutes of the states; nor are they acts which in their nature are immoral . or dishonest. In order to carry out the spirit of the bankrupt system,—an equal division of the bankrupt's property among his creditors,—congress has adopted a conventional rule to determine the validity of these preferences. It has prescribed a limit of four months. Any transfer made within that time is fraudulent and voidable. It is not so because such preferences are morally wrong, but because the act says they are. Bean v. Brookmire, Fed. Cas. No. 1,168. Even payment may be avoided, though made in what seems the ordinary course of business, and others may not, though made out of it. Seven days after the transaction the assignment was filed for registration (it may have been in preparation before), Cobb, in the dual capacity, was evidently insolvent, and the circumstances were such as to put Mr. Sawyer, his attorney, on inquiry. It was an unusual transaction,—giving $7,000 in securities, unasked, for a debt, including the cash, $1,900, of less than half that amount. Being a preference within four months for a pre-existing debt,—Cobb being insolvent,—it is void, and Sawyer is not entitled to a priority in the proceeds of the securities given him as detailed in the testimony. The bankrupt law (section 67e) provides:

"That all conveyances, transfers, assignments, or incumbrances of his property, or any part thereof, made or given by a person adjudged a bankrupt under the provisions of this act subsequent to the passage of this act and within four months prior to the filing of the petition, with the intent and purpose on his part to hinder, delay, or defraud his creditors, or any of them, shall be null and void as against the creditors of such debtor, except as to purchasers in good faith and for a present, fair consideration," etc.

It is not every transfer or incumbrance which falls under the ban of this section. Transfers made in good faith for a present, fair consideration, and transfers of property exempt from execution, cannot be avoided. As was said in Tiffany v. Lucas, 15 Wall. 421, construing a similar section in the act of 1867:

"Clearly all sales are not forbidden. It would be absurd to suppose that congress intended to set the seal of condemnation on every transaction of the bankrupt which occurred within six months of bankruptcy, without regard to its character. A policy leading to such a result would be an excellent contrivance for paralyzing business, and cannot be imputed to congress without an express declaration to that effect. The interdiction applies to sales for a fraudulent object, not to those for an honest purpose. The law does not recognize that every sale of property by an embarrassed person is necessarily in fraud of the bankrupt act. If it were so, no one would know with whom he could safely deal; and, besides, a person in this condition would have no encouragement to make proper efforts to extricate himself from difficulty."

On the day that the $1,900 was loaned, Cobb was in financial distress, individually and as Guirkin & Co. He probably knew he was on the verge of financial disaster, but had not openly failed. He went to his lawyer and told him he needed $3,000 or $3,500. If Sawyer knew or had reasonable grounds to suspect his condition, and, to aid him in his efforts to save himself or his bank from fail-

ure, lent him the money, and took, though he did not demand, securities as a pledge, it was a present, fair consideration, would fall within the exception, and not be a violation of the bankruptcy act. The distinction, at last, is one of intent and bona fides. A man really insolvent, fearing failure, but not having openly failed, and hoping to overcome his business difficulties, violates no provision of the bankrupt law by pledging his property for money lent him in good faith; the money being lent at the time the pledge is made, and the lender having no reason to suppose otherwise than that the loan is to give effect to hopes the debtor might well cherish under such circumstances. Tiffany v. Institution, 18 Wall. 376; Clark v. Iselin, 21 Wall. 360. The pledge seems to have been excessive, if the securities are solvent,—$7,000 for $1,900,—but this can make no material difference. Sawyer is entitled to a priority in the proceeds of such securities, when the same are surrendered to the trustee and by him reduced to money as provided in the statute, for the repayment of $1,900, and legal interest (6 per cent.) from October 12, 1898, until paid. As to the pre-existing debt of $1,302.70 he will share pro rata with other creditors in the distribution of the estate. If such securities are not surrendered to the trustee, that officer will take such proceedings as he may be advised, to recover the same.