[No. 13416. Department One. September 28, 1916.]

AMERICAN SAVINGS BANK & TRUST COMPANY, *Respondent*, v.
J. E. MUNSON *et al., Appellants.*[1]

APPEAL—REVIEW—FINDINGS. Upon directly conflicting evidence
the findings of the trial court supported by the only disinterested
witness, are entitled to great weight, although not conclusive.

PAYMENT—APPLICATION—COLLATERAL—RIGHTS OF HOLDER. Where
insurance policies were held by a bank as collateral to secure the
whole indebtedness of the insured, which included a $5,000 note,
a forced payment on the policies of $6,000 without direction as to
its application, may be applied by the bank to any part of the in-
debtedness, and therefore does not operate as full payment of the
note when not so applied.

BANKRUPTCY—COLLATERAL—TITLE OF TRUSTEE — ADJUDICATION OF
PRIORITY. The trustee in bankruptcy is vested by law with all title
to the assets of the bankrupt, including securities held by the cred-
itor as collateral, especially after being substituted as plaintiff in an
action wherein the securities were in suit; hence the bankruptcy
court had jurisdiction to determine the validity of the creditor's
claim to the collateral.

BANKRUPTCY—DIVIDENDS—CREDITOR HOLDING COLLATERAL—WAIVER
—CONSTRUCTION—EVIDENCE TO EXPLAIN WRITING. Where a bank, hold-
ing insurance policies of a bankrupt as collateral to secure an in-
debtedness, refused to indorse drafts given in settlement of the poli-
cies until after parties in interest had signed a letter directing the
bank to indorse the drafts to the trustee in bankruptcy without in-
curring obligation or responsibility for so doing, such letter is suf-
ficiently indefinite to admit of parol evidence that the bank's pur-
pose was to turn over the drafts to the trustee without waiving any
of its rights against the parties directing such indorsements, and sub-
mitting its claim of priority to the fund for adjudication by the
bankruptcy court.

SAME—DIVIDENDS—ADJUDICATION OF PRIORITY—PARTIES—PERSONS
CONCLUDED. An order of the bankruptcy court declaring a dividend
and adjudicating the claim of a bank to priority in a fund collected
from insurance companies on policies held by the bank as collateral,
is binding upon indorsers who were parties to the settlement with
the insurance companies and who had notice of the intention to de-
clare the dividend, and consented to the payment of the policies to
the trustee while parties to the bankruptcy proceedings, although

[1]Reported in 159 Pac. 1195.

they voluntarily withdrew their claim in the bankruptcy proceeding prior to the declaration of the dividend; in view of their relation to the whole transaction.

SAME—COSTS—ATTORNEY'S FEES—PRIORITY.  The allowance of a $500 attorney's fee to an attorney for a trustee in bankruptcy for collecting $6,000 on insurance policies stands in relation to that fund as money paid or expenses incurred in the preservation of the estate, having priority to all other claims save taxes, under § 64 of the bankruptcy act.

SAME—TRUSTEE'S FEES—WAIVER—PARTIES BOUND BY ALLOWANCE. Parties who made no objection to the allowance of fees to a trustee in bankruptcy, when their attorney was present in court at the time the allowance was made, cannot assert that the trustee had agreed with the attorney not to charge any fees.

APPEAL—REVIEW—FINDINGS—NECESSITY.  A reversal will not be granted for failure to make specific findings upon every controverted question of fact, where the ultimate facts found were sufficient to sustain the judgment.

Appeal from a judgment of the superior court for King county, Jurey, J., entered November 23, 1915, upon findings in favor of the plaintiff, in an action on a promissory note, tried to the court.  Affirmed.

*J. W. Russell*, for appellants Munson.

*Ballinger & Hutson*, for appellants Grant.

*Farrell, Kane & Stratton*, for respondent.

ELLIS, J.—Action for a balance claimed to be due on a promissory note.

Prior to August 19, 1911, the Seattle Table and Manufacturing Company, a corporation, was operating a manufacturing plant in the city of Seattle.  Defendants J. R. Grant, J. E. Munson and George M. Wintermute were, so far as the record shows, the only stockholders.  Between that date and October 14, 1911, both inclusive, plaintiff discounted for the manufacturing company five notes aggregating $5,750, two for $2,000 each, two for $500 each, and one for $750.  These were all made by the Seattle Table and Manufacturing Company, payable to its own order, and in-

dorsed by it and also by Grant, Wintermute and Munson. All of these notes being due and unpaid, on January 4, 1912, a conference was had between Graham K. Betts, plaintiff's cashier, and Grant, Munson and Wintermute, at which it was agreed that, of this indebtedness, $5,000 would be carried by the bank as a carrying account, and the balance of $750 should be paid in thirty days. The two $2,000 notes and the two $500 notes were accordingly consolidated and a new note of that date for $5,000, payable in sixty days, was given. The $750 note was renewed by a thirty-day note. These notes were also made by the manufacturing company payable to its own order and indorsed by it, Grant, Munson and Wintermute. The $5,000 note is the note in suit. The $750 note was not paid at maturity.

The Seattle Table and Manufacturing Company carried nine policies of fire insurance on its plant aggregating $12,-500, issued from April 17 to July 2, 1911, both dates inclusive. When the manufacturing company first began doing business with plaintiff, it deposited these policies with plaintiff, the evidence leaves it in doubt whether as collateral security for the original notes or only for safe-keeping. The policies were all in full force on January 4, 1911. Certain it is that on that date it was agreed between Betts, for the bank, and Wintermute and Munson, for the Seattle Table and Manufacturing Company, that these policies should be held as collateral; but on the question whether as security for the $5,000 note alone, or for any and all indebtedness of the company to the bank, the evidence presents an irreconcilable conflict. It is conceded that the bank was to have these policies renewed at their respective expirations, with the clause inserted usual in such cases, loss if any payable to the bank as its interest might appear. This the bank did as to all of the policies save one, which was also renewed, but from which the loss if any clause was, by inadvertence, omitted.

About the middle of July, 1912, the plant of the Seattle Table and Manufacturing Company was destroyed by fire.

The insurance companies all refused to pay the loss. Suits were brought in the superior court of King county in the name of Wintermute, who held a power of attorney to settle the loss, and the Seattle Table and Manufacturing Company, as plaintiffs, to collect all the policies. The loss claimed was $7,822.72. While these suits were pending, the Seattle Table and Manufacturing Company was put into bankruptcy by its creditors, among them, the bank. L. V. Newcomb, an attorney in the office of Farrell, Kane & Stratton, attorneys for the bank, was appointed receiver in the bankruptcy court and afterwards elected as trustee. He, as trustee, was substituted as plaintiff in the suits on the policies by stipulation. Edward H. Chavelle, who was attorney for Wintermute and the manufacturing company in the original suits, continued to act therein as attorney for the trustee as substituted plaintiff. Later the insurance companies offered $6,000 in settlement of the nine suits. The trustee and the bank favored acceptance. Wintermute objected. Munson, after a conference with Betts, cashier of the bank, consented to the settlement. Grant's attitude in the matter does not appear. The settlement was made. The payment was by drafts, one made payable to the attorneys for the insurance companies and indorsed to the trustee, three made payable to the trustee, and the other five made payable to the bank and the trustee jointly. Before the bank would indorse these five drafts, Kane, one of the attorneys for the bank, insisted upon a written consent thereto by Grant and Munson. Chavelle, who then held a power of attorney from Grant and Munson to collect for them certain claims in the bankruptcy suit, prepared a letter, took it to them and they both signed it. It was addressed to the bank and read:

"I am advised by Mr. Chavelle today that the drafts drawn by the various insurance companies in settlement of the suits of the Seattle Table and Manufacturing Company against them, have in some instances been made payable jointly to L. V. Newcombe, as trustee in bankruptcy of the Seattle

Table and Manufacturing Company, and American Savings Bank & Trust Company, and I direct you to indorse the drafts that are payable to you jointly with Mr. Newcombe, and relieve you from any obligation or responsibility for so doing."

The letter was returned by Chavelle to the bank. The five drafts were then indorsed by the bank and turned over to the trustee, who collected the nine drafts and turned the whole $6,000 of proceeds into the general fund in the bankruptcy court.

The bank, prior to this time, had filed claims in the court against the bankrupt estate based upon the $5,000 note here in suit and all other indebtedness from the bankrupt to the bank, claiming to be a secured creditor on account of the deposit of the insurance policies as collateral. The claims which Chavelle, as attorney for Grant and Munson, had filed against the estate, on objection thereto by the trustee, were disallowed and by him withdrawn with Munson's and Grant's consent on November 4, 1913. On November 7, 1913, an order was made in the bankruptcy court allowing to the bank $4,000 as a dividend, and on April 4, 1914, another order was made allowing to the bank additional dividends aggregating $710.28. Of the total $4,710.28, the bank applied $861 in payment of the thirty-day note and accrued interest; $467.62 in payment of insurance premiums advanced by it in renewing the policies and interest; $211.82 on an overdraft and interest; and the balance, $3,169.84, on the $5,000 note here in suit and the interest thereon, leaving a balance of the principal of $2,662.49 unpaid, for which, with subsequently accruing interest, recovery is sought in this action. There was also allowed, from the $6,000, to Chavelle an attorney's fee of $500, and to the trustee $253 as fees.

This cause was tried to the court without a jury. The court found for plaintiff and entered judgment against defendants for $2,875.45, and for $200 attorney's fee. Defendants Munson and Grant appeal.

It is first contended that the court erred in not holding that the insurance policies were put up as security for the $5,000 note only. As noted in our statement, the evidence on this point was sharply conflicting. Munson and Wintermute were positive that Betts said the bank would hold the policies as security for the carrying account alone. Betts was equally positive that nothing of the kind was said, and that the rule of the bank to hold such collateral for any indebtedness that might exist was so universal that had any exception been made in this case he would certainly have remembered it. Betts was no longer connected with the respondent bank. He was the most disinterested witness who testified on the subject. The trial court evidently believed him. We cannot say that the evidence preponderates the other way. We are not bound by the views of the trial court but they are entitled to great weight. Moreover, the probabilities are with respondent. It is unquestioned that the carrying account was not to exceed $5,000. Had the bank not deemed itself secured by the collateral it would hardly have permitted the thirty-day note to run after due and in addition the overdraft to accumulate. We are satisfied that the policies were held as collateral for the full indebtedness.

Appellants' second contention, that the payment by the insurance companies of the $6,000 operated, as a matter of law, as a payment of the $5,000 note, necessarily falls with their first claim. Since the insurance was held as collateral to the whole indebtedness, respondent had the right to apply the money received from the insurance on any part of that debt. The payment was not a voluntary payment by appellants with a contemporaneous direction as to its application, nor was there any antecedent contract requiring its application alone to the note in question. The case is the converse of that presented in *Ross-Higgins Co. v. Rook*, 65 Wash. 546, 118 Pac. 744, relied upon by appellants.

Nor do we find merit in the claim that the bank should, in any event, be charged with the full $6,000 as money coming

into its possession. In the first place, the drafts were so drawn that the bank could not collect the money on any of them. In the second place, the trustee was vested by law with title to all assets of the bankrupt, including securities held by the creditor as collateral. The bank had no right to hold the securities until its debt was paid, nor to sell them or otherwise realize on them independently of the bankruptcy proceedings. The trustee had sole authority to reduce them to money, and the bankruptcy court had sole jurisdiction to determine the bank's claim to priority of payment from the proceeds.

"The trustee is vested by law with the estate, and could by a proper action recover possession of the securities in possession of any one as collateral, subject to any valid lien such person might have on the proceeds of such securities. The vesting of title gives him constructive possession of the property the instant the title passes. Such property is then brought into the bankruptcy court in its entirety, and under its protection, as fully as if actually brought into the visible presence of the court. No other court and no person acting under process can, without permission of the bankruptcy court, interfere with it, and to so interfere is a contempt. The trustee is an officer of the court, and his possession, actual or legal, is the possession of the court." *In re Cobb*, 96 Fed. 821, 823.

At the time these drafts were drawn, the policies were in suit in the name of the trustee as plaintiff with the consent of all parties concerned. They were, in contemplation of law, in the custody of the trustee. The bank had no such possession as to bar the jurisdiction of the bankruptcy court to determine the validity of its claim. *In re Waterloo Organ Co.*, 118 Fed. 904, 906; *In re Porterfield*, 138 Fed. 192.

In the third place, the letter signed by Grant and Munson authorizing the bank to indorse the drafts, in view of the manner in which the drafts were drawn, can only be construed as intended to authorize the bank to turn the drafts over to the trustee. This letter was dictated by Chavelle,

who, at the time, was not only attorney for the trustee in the suits on the policies, but was then attorney for Grant and Munson in the bankruptcy proceedings. But aside from this, the letter was sufficiently indefinite on its face to admit of parol proof as to its purpose. Such evidence was admitted, and we think properly so. It seems to us overwhelmingly to show that the then understood purpose of all parties was to authorize the bank to indorse and turn over these drafts to the trustee without waiving any of its rights against Grant and Munson as indorsers of the note. In every view of the case, we are clear that the bank was justified in turning these drafts over to the trustee and submitting its claims to the bankruptcy court for adjudication as to its claim of priority in right to the fund.

What we have said sufficiently disposes of the appellants' main contention. But it is urged that the order of the referee in bankruptcy of November 7, 1913, fixing the amount of the dividend on the bank's claim, is not binding on Grant and Munson because three days before they had consented to the disallowance and withdrawal of their own claims. But they had already received notice of the intention of the bankruptcy court to declare dividends while they were in the fullest sense parties to the proceeding (Bankruptcy Act, § 58). If, as appears, they voluntarily withdrew from that proceeding pending the matter in which they now claim to have been most interested, they can hardly be heard to say that they are not bound by the result. It seems to be conceded that, had they been notified of the referee's order so that they might have appeared and appealed from it to the judge of the bankruptcy court, they would be bound by that order. We think they were affected with notice, and their withdrawal on the very eve of the time set for declaring the dividends binds them. There can be no question that the order of the referee was binding upon the bank. The referee had jurisdiction to declare the dividends (Bankruptcy Act, §39a). It was only incumbent upon the bank to establish its priority

right to the $6,000, as against other creditors, in a tribunal of competent jurisdiction. It was not incumbent upon it to appeal from the referee's decision in order to preserve its rights as against Munson and Grant. The bank objected to the order as made and sought to have the whole sum applied to its claim. There is no claim that the order was procured through fraud or collusion. In view of the relation of appellants to the whole transaction, we are clear that they cannot now question the order.

Moreover, the two principal claims allowed by the referee to others than the bank were properly so allowed in any event. The $500 attorney's fee allowed to Chavelle was incurred in collecting the fund. It would seem to stand in the same relation to that fund as money paid or expenses incurred in the preservation of the estate, or expenses incurred in recovering property of the bankrupt for the estate which, under the bankruptcy act, § 64, are among the claims prior to all others save taxes.

As to the $253 fees allowed the trustee, it is claimed that the evidence shows an agreement on Betts' part that if some one from the office of Farrell, Kane & Stratton were appointed trustee he would serve without compensation. It is not claimed that this agreement was ever called to the attention of those attorneys or of the trustee, nor is it claimed that any such agreement was made with either Grant or Munson directly. Chavelle says the agreement was made with him. This was while he was acting as attorney for the Seattle Table and Manufacturing Company and Wintermute in the suits against the insurance companies. There is no competent evidence that he was then attorney for Grant and Munson in any capacity. He was present in court when the referee allowed the trustee fees, and made no objection. As pointed out by the trial court, since Grant and Munson claim only through an agreement made with Chavelle, they ought to be bound by his acquiescence.

Finally, it is claimed that the judgment should be reversed because the court did not make specific findings upon every controverted question of fact. The court, however, did find the ultimate facts. We are satisfied that the findings are sufficient to sustain the judgment, which, under the evidence, we find no sufficient reason to disturb.

Affirmed.

MORRIS, C. J., CHADWICK, MOUNT, and FULLERTON, JJ., concur.